13 A.3d 905

C.M.F., PLAINTIFF–RESPONDENT, v. R.G.F.,
DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued telephonically February 3, 2011—Decided February 25, 2011.

Before Judges PARRILLO, ESPINOSA and SKILLMAN.

*Timothy J. Dey* argued the cause for appellant.

Respondent has not filed a brief.

The opinion of the court was delivered by

ESPINOSA, J.A.D.

Defendant appeals from a final restraining order entered against him on the ground of harassment. We affirm.

Plaintiff filed for and obtained a temporary restraining order based upon allegations of harassment and criminal mischief on January 19, 2009, based upon events of the preceding weekend. By way of background to those events, the parties were engaged in what can fairly be described as protracted and acrimonious matrimonial litigation. However, in November 2007, they agreed to share custody of their children and possession of the former marital residence on a fifty/fifty basis. Pursuant to this arrangement, each lived at the house for three and one-half days of the week with their children, and then left one hour before the arrival of the other to assume residence. In this way, they existed, without incident or seeing each other, for a substantial period of time.

On Friday, January 16, 2009, plaintiff received a copy of an order in response to motions each party had filed to change the fifty/fifty arrangement.[1] The order granted plaintiff exclusive possession of the residence and directed defendant to pay the carrying costs. Plaintiff testified that she sent defendant a text message to inform him about the order and that she would have their twin sons ready to be picked up at eight or nine that evening. She then picked up the boys from basketball practice and also told them that the judge had decided that she would stay in the house full-time; that they would still see both parents the same amount of time but they would spend their time with their father away from the home. She dropped the boys off at a basketball game after dinner and again sent a text message to defendant to let him know that the boys were at the game, would call him when it was over, and that she would leave their bags on the front porch.

At approximately 9:00 p.m., defendant arrived at the house; the parties' older son arrived in a separate car with the younger twin boys. One of the younger boys called plaintiff on the phone and

---

[1] In his brief, defendant states that each had moved for exclusive possession of the marital home and that defendant had indicated his consent to plaintiff having exclusive possession on the condition that she be responsible for all carrying costs.

accused her of lying to them, which she denied. Plaintiff testified that the boys returned to the car before she could open the door; defendant testified that she refused to open the door. Defendant called the Woodbridge police. Plaintiff showed the police officer the court order. He in turn showed the order to defendant. Plaintiff testified that defendant was "very enraged ... very angry and he screamed right away" that he wanted to see the judge's signature. She stated further that he started to scream that he would take her back to court and not return the boys home on Sunday night. Plaintiff got upset, started to cry and turned to the police officer for help. The officer told her to go into another room while he spoke to defendant. He remained at the home for approximately twenty minutes after defendant left with the boys.

On the following day, defendant was present at their twin boys' afternoon basketball game. Plaintiff gave the following account of what transpired. She testified that she asked a friend to go with her to the game because she was frightened to go alone; that she knew defendant's state of mind and that he was very angry. When they arrived at the gym, it was quite crowded; everyone was sitting in one set of bleachers. They found a spot in front of two women that plaintiff knew. One of the women moved her handbag to give them a seat. Plaintiff stated that, just as she was sitting down, she heard defendant "screaming down verbally abusive words from the stands at [her] immediately."

> [T]he first thing he screamed down was pig, real loud, pig. And I, I was uh, shocked and stunned as everyone else in the stands, these are all people that we have been going, these are all parents around us that we have been—our children have been playing basketball with since like fifth grade you know, it was quite alarming. So he screamed down pig and then he screamed down, you're a whore, you're a slut, and you're a f___ing bitch, he just kept going. It was—he was not stopping. He was enraged. He was furious. He was not stopping.

Plaintiff did not stay at the marital residence that evening. When she returned on the following day, there was a dead cat, its head smashed, lying on the trunk of her car, and the front picture window of the house was shattered.

Defendant testified that he called the police on January 16 when plaintiff would not open the door and that the first he heard of the

order granting her exclusive possession of the home was that evening when the police officer showed it to him. He had neither asked for nor agreed to such an arrangement. He agreed that he demanded to see the judge's signature but, in contrast to plaintiff's description of his behavior, he testified that, after seeing the judge's signature, he said there is nothing that he can do and that he just left. Regarding the basketball game, he said that the gym was three-quarters empty when plaintiff chose to sit a short distance away from him. He admitted calling her "some bad names" but maintained that he was not angry, despite the fact that he had said so in an earlier certification. He said that he "was just very upset and concerned for [his] children." Defendant also denied putting the dead cat on plaintiff's car or breaking the window.

Plaintiff also testified about prior incidents of domestic violence. She described an incident in July 2007 in which she arrived at home, defendant opened the car door and repeatedly kicked her in the thigh and shoved her back in the car when she tried to get out. The police were called. She filed a complaint and, according to the records submitted in court, defendant pled guilty to violating a township ordinance.

Plaintiff also filed an application for a temporary restraining order based upon harassment in November 2007 "because he was carrying around a club around the house intimidating me and the children, carrying around a weapon." She stated that he was constantly cursing at her and calling her names such as a pig and a whore. She filed the application after he took the children away from her. This complaint, along with a complaint defendant had filed against her, was dismissed by the court after a hearing.

Plaintiff testified about other occasions in which defendant called her similar names—at least once in public and on another occasion, breaking into her locked bedroom at 12:30 a.m., waking her up to scream at her. She also stated that, prior to filing the

complaint for divorce, defendant had destroyed her cell phone and disabled her car by detaching wires.

After a hearing, the trial court found that the allegation of criminal mischief had not been proven by a preponderance of the evidence. The court also stated the view that the words spoken at the basketball game, alone, were insufficient to warrant a final restraining order. However, the court concluded that, when the conduct was viewed within the context of the prior incident of physical abuse in 2007, defendant's breaking her cell phone and pulling out wires from her car, the elements of harassment were proven.

In his appeal, defendant presents the following issues for our consideration:

*POINT I*

[DEFENDANT'S] CONDUCT WAS NOT HARASSMENT AS PER NEW JERSEY LAW

*POINT II*

[DEFENDANT] DID NOT HAVE THE PURPOSE TO HARASS REQUIRED UNDER THE STATUTE

*POINT III*

THE TOTALITY OF THE CIRCUMSTANCES DOES NOT SUPPORT A FINAL RESTRAINING ORDER

In reviewing a decision of a family court, we "defer to the factual findings of the trial court," *N.J. Div. of Youth and Family Servs. v. E.P.*, 196 *N.J.* 88, 104, 952 *A.*2d 436 (2008), in recognition of the "family courts' special jurisdiction and expertise in family matters...." *N.J. Div. of Youth and Family Servs. v. M.C. III*, 201 *N.J.* 328, 343, 990 *A.*2d 1097 (2010); *Cesare v. Cesare*, 154 *N.J.* 394, 413, 713 *A.*2d 390 (1998). It is only "when the trial court's conclusions are so 'clearly mistaken' or 'wide of

the mark'" that we will intervene and make our own findings "to ensure that there is not a denial of justice." *E.P., supra,* 196 *N.J.* at 104, 952 *A.*2d 436.

In this case, the factual findings of the family court regarding defendant's conduct on January 17, his prior acts in disabling plaintiff's car and destroying her cell phone and a prior incident in 2007 are supported by the credible evidence. We also agree that defendant's conduct on January 17 supported a finding of harassment, although we reach that conclusion through a somewhat different path.

The final restraining order was based upon a finding that defendant had committed an act of harassment. *N.J.S.A.* 2C:33–4 states, in pertinent part:

[A] person commits a petty disorderly persons offense if, with purpose to harass another, he:

a. Makes, or causes to be made, *a communication* or communications anonymously or at extremely inconvenient hours, or *in offensively coarse language, or* any other manner *likely to cause annoyance or alarm;*

. . . .

c. Engages in any other course of alarming conduct or of repeatedly committed acts *with purpose to alarm or seriously annoy such other person.*

(Emphasis added.)

In *State v. Hoffman,* 149 *N.J.* 564, 695 *A.*2d 236 (1997), our Supreme Court addressed the question whether the act of mailing a torn-up support order on two occasions by one former spouse to the other constituted a violation of the harassment statute, *N.J.S.A.* 2C:33–4(a). The Court stated that the following elements were required to establish such a violation:

(1) defendant made or caused to be made a communication;

(2) defendant's purpose in making or causing the communication to be made was to harass another person; and

(3) the communication was in one of the specified manners or any other manner similarly likely to cause annoyance or alarm to its intended recipient.

[149 *N.J.* at 576, 695 *A.*2d 236]

Defendant conceded that he engaged in offensively coarse language. He therefore conceded that the first and third elements identified by the Court were satisfied. However, he disputed that he engaged in such conduct with the requisite intent to harass. In discussing the evidence necessary to establish such intent, the trial court relied upon cases in which a single outburst was deemed to be the product of transitory anger and insufficient to establish the requisite intent. *See State v. L.C.*, 283 *N.J.Super.* 441, 662 *A.*2d 577 (App.Div.1995), *certif. denied*, 143 *N.J.* 325, 670 *A.*2d 1066 (1996); *Peranio v. Peranio*, 280 *N.J.Super.* 47, 654 *A.*2d 495 (App.Div.1995); *see also J.N.S. v. D.B.S.*, 302 *N.J.Super.* 525, 695 *A.*2d 730 (App.Div.1997). However, we note that each of these cases was decided prior to the Supreme Court's decision in *Hoffman*, which clarified that "the 'serious annoyance' required by subsection (c) [should not] be engrafted into the 'annoyance' required under subsection (a)."

> We are satisfied that the Legislature intended that the term "annoyance" should derive its meaning from the conduct being scrutinized.... [S]ubsection (a) proscribes a single act of communicative conduct when its purpose is to harass. Under that subsection, *annoyance means to disturb, irritate, or bother.*

[*Id.* at 580, 695 *A.*2d 236]

Moreover, the Court observed that, "in enforcing subsection (a) of the harassment statute, we must focus on the mode of speech employed." *Id.* at 583, 695 *A.*2d 236. The statute criminalizes speech that invades one's privacy by "its anonymity, offensive coarseness, or extreme inconvenience" because it is "aimed, not at the content of the offending statements but rather at the manner in which they were communicated." *Id.* at 583–84, 695 *A.*2d 236 (quoting *State v. Finance Am. Corp.*, 182 *N.J.Super.* 33, 39–40, 440 *A.*2d 28 (App.Div.1981)).

As noted, defendant conceded that his speech was offensively coarse. His mode of speech thus fell within one of the enumerated categories that is targeted by the statute as invading one's

privacy. The next question is whether he engaged in such conduct with the intent "to disturb, irritate, or bother" plaintiff.

Defendant now contends that he was angered by "an admittedly mistaken court order ... that turned [him] out of his own home." He has also testified that he was not motivated by anger but has offered no other motivation for making the offensive statements to plaintiff.

Even if defendant's anger over a court order is deemed to be the catalyst for his outburst, that will not shield his conduct from the reach of *N.J.S.A.* 2C:33-4(a). Defendant seems to suggest anger somehow negates an intent to harass and therefore could serve to excuse his behavior in this case. We do not view these mental states as mutually exclusive. On the contrary, there is sufficient evidence from which to infer that defendant acted with the requisite state of mind to constitute harassment. Indeed, the very nature of the verbal attack, the manner of its delivery and the attendant circumstances all strongly suggest a purpose to harass. Defendant was fully aware that his outburst of profanity occurred not only in public but in front of the parties' children and the parents of their children's classmates with whom plaintiff would have to interact in the future. Surely, he knew that his offensively coarse language would disturb, irritate and annoy plaintiff under these circumstances and, therefore, acted with the intent to cause that result. Simply put, defendant cannot escape the consequences of his conduct by contending that he was merely angry.

Further, because the totality of the circumstances are to be considered in evaluating the defendant's manner of speech, it was entirely appropriate for the trial court to consider prior conduct of his that reflected an intent to disturb, irritate or bother plaintiff, i.e., defendant disabling her car, destroying her cell phone and his guilty plea to violating a township ordinance related to an assault upon her. As the trial court observed, the evidence regarding defendant's prior acts supported the conclusion that defendant's

purpose in directing the offensively coarse language at plaintiff was to harass her.

Affirmed.